IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

GEORGIA ROSA LEBOW,

        Plaintiff,

vs.                                  No. CIV 97-1276 LFG/RLP

THE CITY OF CLOVIS,

        Defendant.

## MEMORANDUM OPINION
## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

THIS MATTER came before the Court on the City of Clovis' ("City") June 24, 1998 Motion for Summary Judgment for Counts I, II, III and V of Plaintiff's Complaint [Doc. 31]. The Court considered the City's motion, Plaintiff Georgia Rosa Lebow's ("Lebow") response in opposition, and the City's reply, and determines that oral argument is not necessary. This matter may be resolved based on the parties' submissions.

## Summary Judgment Standards

Summary judgment is appropriate when the moving party can demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S. Ct. 1598 (1970); *Quaker State Minit-Lube, Inc. v. Firemen's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995). The party moving for summary judgment must shoulder the initial burden of establishing the absence of a question of fact. *Adickes*, 398 U.S. at 144. That burden is carried when the moving party demonstrates that the undisputed facts entitle the moving party to judgment. *Celotex Corp. v Catrett*, 477 U.S. 317, 106 S. Ct. 2548 (1986). That initial burden can be shouldered when the moving party

demonstrates by way of admissible evidence, by deposition, answers to interrogatories, admissions, affidavits or documentary evidence that the undisputed facts entitle the moving party to judgment. *Id.*

A party opposing summary judgment must do more than rely on its pleadings or mere argument or contention to defeat a prima facie showing of an entitlement to judgment. Federal law provides that the party opposing the motion for summary judgment must affirmatively come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial. *Id.* at 324. "Hearsay testimony cannot be considered because `[a] third party's description of [a witness'] supposed testimony is not suitable grist for the summary judgment mill.'" *Gross v. Burggraf Const. Co.,* 53 F.3d 1531, 1540 (10th Cir. 1995)(quoting *Thomas v. International Business Machines*, 48 F.3d 478, 485 (10th Cir. 1995)). This requirement is made clear in the rule itself:

> An adverse party may not rest upon mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided by this rule, must set forth specific facts showing there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, will be entered against the adverse party.

Fed. R. Civ. P. 56. Thus, the burden on the party opposing a motion for summary judgment is significantly greater when the moving party successfully makes a prima facie showing entitlement to judgment. The test is not whether the party opposing the motion will be able to demonstrate a factual dispute at trial, but, rather, whether that party can demonstrate the presence of a material, factual dispute in response to the moving party's prima facie showing. The Court will consider the City's motion in light of the above standards.

Lebow brings the instant action against the City alleging violations of her civil rights under 42 U.S.C. § 2000(e) ("Title VII") and the New Mexico Human Rights Act.  She brings claims for a hostile work environment, retaliation, a state law claim for retaliation, negligent supervision and constructive discharge.  On April 23, 1998, the Court dismissed the claim for negligent supervision.  The City now moves for summary judgment on the remaining grounds.  The City denies that any of Lebow's allegations have merit and argues that summary judgment should be entered in its favor.

## **Background**

The City operated a public golf course.  Rupert Benjamin Martinez ("Martinez") was employed as golf course superintendent.  His job duties included oversight and supervising grounds keepers. (Def. Reply M.S.J., Ex. I, Aff. Martinez ¶ 1).  On March 25, 1996, Martinez hired Lebow as a seasonal grounds keeper.  This was a temporary position that would end September 20, 1996.  (*Id.* ¶ 2; Def. M.S.J. Ex. A, Aff. Gonzales, ¶ 2; Ex. B, Lebow Dep. p. 59, lines 16-17, p. 60, lines 17-22).  The City had a personnel policy which defined sexual harassment as any unwanted and/or repeated physical or verbal action and the policy prohibited harassment on the basis of sex.  The policy applied to all City employees. (*Id.*, Ex. A, Gonzales Aff. ¶ 4).  Toward the end of April, Lebow told her supervisor, Martinez, that she had been harassed because of her gender by several of her co-workers at the golf course.  Lebow identified as her harassers, Daniel Tapia ("Tapia"), Orlando Ortiz ("Ortiz") and the golf professional, Floyd Harris ("Harris").  Harris was not a City employee.  Martinez told Lebow to memorialize her complaints in writing. (*Id.*, Ex. I, Aff. Martinez, ¶¶ 3, 4, 5; Ex. B, Lebow Dep., p. 107, lines 5-8, 2-21).  Lebow wrote a seven-page complaint dated April 21, 1996. (*Id.*, Ex. C).  With regard to Harris, Lebow wrote that, on April 10 or 11, Harris called her "girl" and said "what the f--- are you doing here if you don't know how to play golf."

Lebow described feeling hurt and shocked by his attitude.  Lebow felt that Harris treated her like a "dumb girl."

With respect to Tapia, Lebow complained that he asked about her personal life.  She took offense at being asked "why did your husband leave you?  You have such a nice smile."  Lebow, likewise took offense when Tapia called her a "stupid bitch".  Lebow complained that she perceived Tapia checked up on her more often than other employees.

Lebow alleged that Ortiz once asked about her perfume.  He came up behind her, lifted her hair, put his arm around her and nuzzled her neck saying, "man, your perfume is driving me wild."  Anther time, Ortiz came into the shop, pinned Lebow up against a golf cart and put his hand around her.  Ortiz squeezed Lebow's buttocks and demanded a kiss.  The next day, Ortiz ran his hand along her leg while passengers in a vehicle, and later brushed his leg against Lebow's.  Lebow also described an incident where Ortiz came to the office, grabbed her wrist and asked, "what's that perfume" and tried to unbutton her shirt.  Finally, Lebow said that Ortiz asked her to bend over longer when she pumped gas.  Lastly, Lebow claimed that Ortiz asked where she lived and volunteered to come over and "sex her up."

Lebow gave her complaint to Martinez, who in turn, gave copies to Reuben Gonzales ("Gonzales")  and Joe Thomas ("Thomas").  (*Id.*, Ex. I, Martinez Aff., ¶ 6).  Gonzales, was the Director of Parks and Recreation for the City.  Gonzales' duties included the oversight and supervision of the golf course. (*Id.*, Ex. A, Gonzales Aff., ¶¶ 1, 6) Thomas served as Director of Public Works for the City.  Thomas' duties included the oversight and supervision of the Public Works Department.  The golf course was part of this department.  ( *Id.,* Ex. D, Thomas Aff., ¶ 1).  Upon receipt of Lebow's complaint, Gonzales told Martinez that Lebow's concerns would be

4

addressed. (*Id.,* Ex. I, Martinez Aff., ¶ 7). The next day, a meeting was held at eight a.m. to discuss Lebow's statement. Attending the meeting were Lebow, Martinez, Thomas and Gonzales. Lebow was questioned about her statement. Lebow described all incidents in her statement. Lebow was told that her complaints would be looked into and appropriate action taken. She was also told to immediately notify Thomas or Gonzales if any other problems arose. (*Id.*, Ex. A, Gonzales Aff., ¶ 8; Ex. D, Thomas Aff., ¶¶ 5, 6).

On April 24, 1996, the City took the following actions in response to Lebow's allegations. Gonzales counseled Tapia verbally and in writing about the use of inappropriate language and told Tapia that further infractions would result in severe disciplinary action. (*Id.,* Ex. B, Gonzales Aff., ¶ 9). Tapia admitted using the word "bitch," but denied making comments of a sexual nature. (*Id.,* Ex. E, Tapia Aff., ¶ 2). Tapia states he subsequently avoided unnecessary conversation with Lebow and limited his interaction to work assignments. (Id., Ex. E, Tapia Aff., ¶ 5).

Similarly, Thomas counseled and reprimanded Harris, verbally and in writing. Harris was told that offensive language towards City employees was not tolerated and such conduct would not be allowed. (*Id.*, Ex. D, Thomas Aff., ¶ 7, Ex. D-1). After April 24, 1996, Lebow had no further interactions with Harris. (*Id.*, Ex. B, Lebow Dep., p. 152, lines 13-19, p. 153, lines 20-22; p. 154, lines 13-15).

Finally, in response to Lebow's allegations against Ortiz, the City terminated his employment. The City found his behavior violated the City's personnel policy prohibiting sexual harassment. (*Id.*, Ex. A, Gonzales Aff., ¶ 10; Ex. D, Thomas Aff., ¶ 8; Ex. B, Lebow Dep., p. 188, lines 13-14, p. 190 lines 15-22; p. 191 lines 1-3; p. 230 lines 11-14; p. 247, lines 21-23; p. 251, line 25, p. 252 lines 1-3; Ex. I, Martinez Aff., ¶¶ 9, 10; Pl. Resp. M.S.J., Ex. B)

Between April 24, 1996 and July 5, 1996, Gonzales went to the golf course an average of two to three times a week. There, he saw Lebow and asked her how things were going. Lebow did not mention any problems with her work environment and made no complaints of continuing harassment or retaliation. (*Id*., Ex. A, Gonzales Aff., ¶ 12; Ex. B, Lebow Dep., p. 92, lines 18-25).

Tapia continued to work with Lebow, but he was not her supervisor. (*Id*., Ex. B, Lebow Dep., p. 68, lines 17-24). Tapia was a close personal friend of Ortiz. (Pl. Resp. M.S.J., Ex. A; Def. M.S.J., Ex. E, Tapia Aff., ¶ 7). Ortiz, as a private citizen, returned to the golf course on a few occasions after his termination to play golf and to talk to Tapia. (*Id*., Ex. F, Pl. Ans. Interr. No. 18). Tapia never saw Ortiz speak with or be near Lebow. (*Id*., Ex. E, Tapia Aff., ¶ 8). Lebow stated that she had no interactions with Ortiz. (*Id.*, Ex. B, Lebow Dep., p. 247 lines 21-23; p. 252, lines 2-3). Lebow claims that Tapia was overheard by Russell Pollard saying that when he becomes superintendent, he was going to bring back Ortiz. (*Id*., Ex. B, Lebow Dep., p. 214, lines 21-23). This greatly concerned Lebow. However, Lebow never heard Tapia specifically say he would rehire Ortiz as a seasonal grounds keeper. (*Id*., Ex. B, Lebow Dep., p. 207, lines 12-15; p. 214 lines 13-20) cf (Pl. Resp. M.S.J., Ex. A, Lebow Aff., ¶¶ 1, 3). Lebow states she told Thomas that Tapia said he was going to be her supervisor, but that Thomas did not act concerned. Lebow did not view Thomas' inattention as retaliation. (*Id*., Ex. B, Lebow Dep., p. 215, lines 1-15). In late June, Lebow told Gonzales that she could not work for Tapia because he was going to insist on bringing Ortiz back. Gonzales told her that Ortiz was not available for rehire. (*Id*., Ex. B, Lebow Dep., p. 132, lines 3-25).

Lebow states that in mid-June, Tapia rubbed her shoulders and said he wanted to hear her say "yes," and that two inmates saw this. (*Id*., Ex. B, Lebow Dep., p. 120, lines 15-19; p. 215, lines 16-

22; Ex. F, No. 14; Pl. R.M.S.J., Ex. A, Lebow Aff., ¶ 5). Lebow could not recall if she reported this to Martinez. (Id., Ex. B, Lebow Dep., p. 120, lines 24-25) cf (#2).

Martinez avers that Lebow never complained to him about additional sexual harassment or retaliation by Ortiz, Tapia or Harris between April 24 and July 5, 1996. So, he had no complaints to pass on to Gonzales or Thomas. (*Id.*, Ex. I, Martinez Aff., ¶¶ 12, 14). Lebow subsequently stated that about the third week in June, she complained to Martinez about the retaliatory acts, but that he did not pass on her complaints to Gonzales or Thomas. (Pl. R.M.S.J, Ex. A, Lebow Aff., ¶ 8).

Likewise, Thomas heard of no additional complaints made by Lebow from April 25, 1996 through the date she resigned. (*Id.*, Ex. D, Thomas Aff., ¶ 9). Lebow stated she went with Russell Pollard and Donnie Roberts to see Thomas and to complain about what Tapia was saying about Martinez. Lebow claims she asked for counseling, but Thomas denied her request.

On July 5, 1996, Martinez resigned as golf course superintendent because he did not have the necessary credentials for golf course management. (*Id.*, Ex. A, Gonzales Aff., ¶ 13; Ex. D, Thomas Aff., ¶ 10). That same day, Lebow resigned stating that she did not want to work at the golf course without Martinez. (Pl. R.M.S.J., Ex. A, ¶ 13; Def. M.S.J., Ex. D, Thomas Aff., ¶ 10). As of the date she resigned, Lebow had made no further written complaints of retaliation or sexual harassment. (*Id.*, Ex. A, Gonzales Aff., ¶ 13; Ex. D, Thomas Aff., ¶ 11). Lebow stated that she liked and trusted Martinez and Gonzales. (*Id.*, Ex. B, Lebow Dep., p. 69, lines 19-20; p. 77, lines 12-20; p. 78, lines 12-13; p. 94, lines 9-14).

### Count I - Title VII Claim

Lebow's Title VII sexual harassment claim is based on a hostile work environment she encountered working as a seasonal grounds keeper. Lebow alleges that she was subjected to

7

unwelcome, severe and pervasive sexual advances, comments and contact. (Pl. Complaint ¶ 22). Lebow claims that, notwithstanding her complaints, the City failed to investigate and to respond to her concerns. She also claims her employment situation became so unbearable and intolerable that she had to quit.

An actionable Title VII hostile work environment claim exists "where [sexual] conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment." *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65, 106 S. Ct. 2399 (1986). "An employee may prevail in an action for sexual harassment either if the asserted harassment was pervasive or if there was only a single incident of harassment which, standing alone, was sufficiently severe to alter the conditions of employment and create an abusive working environment. *Creamer v. Laidlaw Transit, Inc.,* 86 F.3d 167, 169 (10th Cir.) *cert. denied,* 117 S. Ct. 437 (1996). Whether a work environment is hostile or abusive is a case-by-case determination guided by no sharply defined rules. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993). Circumstances to consider include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required. *Harris*, 510 U.S. at 23. In *Seymore v. Shawver & Sons, Inc.,* 111 F.3d 794 (10th Cir.), *cert. denied*, 118 S. Ct. 342 (1997), the Tenth Circuit set forth the elements of a hostile work environment claim: (1) the plaintiff belongs to a protected group; (2) the plaintiff was subject to unwelcome harassment; (3) the harassment was based on the plaintiff's sex; (4) the

8

alleged harassment was sufficient to affect a term or condition of employment; and, (5) the employer either actively engaged in the harassment or is in some position on which liability can be imputed. The City argues that Lebow has not meet her burden on the fifth element, employer liability.

Trial courts and intermediate appellate courts have had the arduous task of formulating a definitive rule on defining employer liability in the context of Title VII ever since the Supreme Court declined to do so in *Meritor Sav. Bank F.S.B. v. Vinson*. Indeed, it was not until the close of the 1998 term that the Court announced the standard applicable for employer liability for a hostile environment created by a supervisor. *Faragher v. City of Boca Raton*, 118 S. Ct. 2275, 1998 WL 336322 (U.S. June 26, 1998); *Burlington Industries, Inc. V. Ellerth*, 118 S. Ct. 2257, 1998 WL 336326 (U.S. June 26, 1998). However, the *Burlington Industries'* test is not applicable in the case at bar because our inquiry is employer liability for harassment between co-workers. The United States Court of Appeals for the Tenth Circuit in *Adler v. Walmart Stores Inc.,* ___ F.3d ___, 1998 WL 247700 (10th Cir. May 18,1998)(No. 97-1026) recently addressed this issue. The Tenth Circuit's discussion is instructive and applicable:

> In accordance with *Meritor*, this Court has identified three alternative bases drawn from agency principles for holding an employer liable for hostile work environment harassment. These are (1) where the acts are committed by an employee acting "within the scope of [his or her] employment;" (2) where the employer was negligent or reckless; or (3) where the employee purported to act or to speak on behalf of the employer and there was reliance upon apparent authority, or the harasser was aided by the agency relation.

*Adler*, 1998 WL 247700*6 (citations omitted). *See also Jeffries v. State of Kansas*, ___ F.3d ___, 1998 WL 318533 (10th Cir. Jun 17, 1998) (No. 96-3381).

Here, Lebow alleges the City was negligent in failing to respond to and to investigate her

9

allegations of sexual harassment, and, therefore, falls within the second alternative basis. The Court instructed in this situation to look at the following:

> "Under this theory of employer liability, the plaintiff must establish that the employer had actual or constructive knowledge of the hostile work environment but did not adequately respond to notice of the harassment." We have also said in this context that employer negligence is "'failing to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known.'" This is not derivative liability according to the doctrine of respondeat superior, but direct liability for negligence. Because an employer is only potentially liable for negligence in remedying and preventing harassment of which it negligently failed to discover, courts must make two inquires: first, into the employer's actual or constructive knowledge of harassment, and, second, into the adequacy of the employer's remedial and preventative responses to any actually or constructively known harassment. (citations omitted).

*Id.* at *6.

### Employer Knowledge

The law is clear that an employer is only obligated to respond to harassment of which it actually knew, or, in the exercise of reasonable care, should have known. Here, it is undisputed that the City was aware of Lebow's alleged incidences of harassment contained in her seven-page summary submitted on April 21, 1996. Therefore, the Court finds that Lebow has met this first requirement. Accordingly, the Court must consider the adequacy of City's response.

### Employer Response

Lebow asserts the City did not respond to her complaints. Lebow maintains that no investigation was taken and the offensive behavior continued. The Tenth Circuit in *Adler* gave instruction concerning the evaluation of the employer's response.

> [W]e adopt the test employed by some of our sister circuits, asking whether the remedial and preventive action was "reasonably calculated

to end the harassment." A stoppage of harassment shows effectiveness, which in turn evidences such reasonable calculation. However, this is not the sole factor to be considered. Because there is no strict liability and an employer must only respond reasonably, a response may be so calculated even though the perpetrator might persist.

In cases where effectiveness is not readily evidenced by a stoppage, we consider the timeliness of the plaintiff's complaint, whether the employer unduly delayed, and whether the response was proportional to the seriousness and frequency of the harassment. Courts have explained that simply indicating to a perpetrator the existence of policy against harassment is usually insufficient. By way of example, responses that have been held reasonable have often included prompt investigation of the allegations, proactive solicitation of complaints, scheduling changes and transfers, oral or written warnings to refrain from harassing conduct, reprimands, and warnings that future misconduct could result in progressive discipline, including suspension and termination.

The employer is, of course, obliged to respond to any repeat conduct; and whether the next employer response is reasonable may very well depend upon whether the employer progressively stiffens its discipline, or vainly hopes that no response, or the same response as before, will be effective. Repeat conduct may show the unreason-ableness of prior responses. On the other hand, an employer is not liable, although a perpetrator persists, so long as each response was reasonable. It follows that an employer is not required to terminate a perpetrator except where termination is the only response that would be reasonably calculated to end the harassment.

Unfortunately, some harassers may simply never change. Just as unfortunate, a victim may have to suffer repeated harassment while an employer progressively disciplines the perpetrator to determine whether he or she is just such a "hard head" case. It is some consolation for the victim that, to be reasonable, responses must progress more rapidly in proportion to more serious and frequent harassment. The courts, however must balance the victim's rights, the employer's rights, and the alleged harasser's rights. If our rule were to call for excessive discipline, employers would inevitably face claims from the other direction of violations of due process rights and wrongful termination. (citations omitted).

11

*Id.* at 10, 11.

The undisputed material facts show that the City, upon hearing of Lebow's concerns, scheduled a meeting for early the next morning, and, after hearing what occurred, took immediate steps to prohibit further misconduct. The steps included the issuance of warnings and/or termination. Not more than forty-eight hours had passed. The Court finds that the City conducted a prompt investigation. Second, the undisputed material facts show that Lebow was questioned about her contentions, and the City, in turn, formulated responses in accord with the seriousness of each allegation.

The evidence demonstrates that Harris, the golf pro, who was not a City employee, was issued a written warning and was told to refrain from harassing conduct. Similarly, Tapia, a City employee, was given the same warning and told that other infractions would lead to severe disciplinary action. Turning to the more egregious allegations involving Ortiz, the City immediately terminated his employment. The evidence shows that the City's response was proportional to the nature of harassment. There is no indication the City should have punished the three men more severely than the warnings or termination given. "`[W]hat is reasonable depends on the gravity of the harassment . . . . [A]n employer is required to take more care, other things being equal, to protect its female employee from serious sexual harassment than to protect them form trivial harassment.'" *Jeffries*, 1998 WL 318533*8 (quoting *Baskerville v. Culligan Intern. Co.*, 50 F.3d 428, 432 (7th Cir. 1995)). The allegations against Tapia and Harris were not as egregious as those made against Ortiz, and the City's response reflected the same. In addition, the City sought proactive solicitation of complaints from Lebow. Gonzales went to the golf course several times a week and monitored the situation. He inquired of Lebow how things were going. In fact, when Lebow heard rumors that Ortega might

be rehired, she asked Gonzales about the validity of the rumors.  Although Lebow argues Tapia continued with his offensive behavior, the City has shown that Lebow lodged no further written or oral complaints, notwithstanding being instructed to do so.  In sum, Lebow has not brought sufficient evidence to the Court's attention to establish the essential element for employer liability, specifically, that the City failed to respond adequately to the harassment.  In the absence of additional written or oral complaint made to Gonzales, Martinez or Thomas, there is nothing that would have placed the City on notice of Tapia's alleged comments. The City had no reason to believe that Lebow was encountering additional problems.  Lebow saw Martinez daily and Gonzales several times a week. Indeed, "absent a reason for suspicion, an employer is not required to engage in `an Orwellian program of continuous surveillance.'"  *Jeffries,* 1998 WL 318533*8(quoting *Zimmerman v. Cook County Sheriff's Dept,*. 96 F.3d 1017, 1019 (7th Cir. 1996).  In situations involving harassment by a co-employee, the harassed employee must bear some degree of responsibility to notify the employer of the co-employee's misconduct.  This is especially so where the harassed employee knows, as did Lebow here, that a complaint would result in the employer taking action to remedy the problem. Lebow did not complain until after she resigned and filed an administrative complaint with the EEOC.

In conclusion, upon being apprised of the inappropriate conduct, the City took immediate action reasonably calculated to prevent future misconduct.  Remedial action was carried out within forty-eight hours of notice and the methods employed to put a stop to the inappropriate behavior were those endorsed by the Tenth Circuit in *Adler*.  There are no material facts in dispute and summary judgment should be entered in the City's favor on Count I.  Lebow's attempts to create factual disputes to defeat summary judgment may properly be discounted.  Lebow's allegations contained in her affidavit are contrary to her earlier deposition testimony and responses to discovery.

13

The Court weighed the affidavit completed in response to the City's motion for summary judgment with Lebow's earlier deposition testimony and discovery responses. "[A] party cannot create a genuine issue of fact by submitting an affidavit containing conclusory allegations which contradict plain admissions in prior deposition or otherwise sworn testimony." *Diliberti v. United States,* 817 F.2d 1259, 1263 (7th Cir. 1987). The Court concludes that Lebow may not unilaterally create a material issue by simply contradicting her own testimony.

### Counts II & III  - Federal and State Retaliation Claims

The City also moves for summary judgment with respect to Lebow's federal and state retaliation claims. Lebow asserts that her supervisors took no action to stop the harassment and she had no choice but to quit. The City counters that the evidence clearly demonstrates that the City took prompt, remedial action to stop the harassment, and, indeed, Lebow never came forward with new complaints, and she resigned on her own volition.

The Tenth Circuit in *Jeffries* outlined the basis for a retaliation claim:

> According to Title VII, "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or earing under this subchapter." In order to demonstrate retaliation:
>
>> "[a] plaintiff must first establish a prima facie case of retaliation. If a prima facie case is established, then the burden of production shifts to the defendant to produce a legitimate, nondiscriminatory reason for the adverse action. If evidence of a legitimate reason is produced, the plaintiff may still prevail if she demonstrates the articulated reason was a mere pretext for discrimination. The overall burden of persuasion remains on the plaintiff." In order to make out a prima facie case, a plaintiff must prove:

14

> (1) protected opposition to discrimination or participation in a proceeding arising out of discrimination; (2) adverse action by the employer; and (3) a causal connection between the protected activity and the adverse action. A plaintiff may maintain an action for retaliation based on participation in a protected proceeding regardless of whether the conduct forming the basis of her underlying complaint is adjudged to violate Title VII. (citations omitted).

The analysis is the same for Lebow's state law claim. *See Behrman v. Phottron Corp,*, 110 NM 323, 795 P.2d 1015 (1990). Lebow argues that she quit her temporary grounds keeper position because, with Martinez's resignation, she would not feel comfortable working at the golf course. Lebow felt that Tapia would become her supervisor and Ortiz would be rehired. She also alleges that Tapia made disparaging comments about Martinez that she found offensive.

The Court finds that Lebow cannot meet her prima facie burden of production as there is no evidence of any adverse employment action. As discussed above, Lebow's April concerns were acted upon promptly and swiftly, and she was told to report any further incidents. The City came forward with evidence to show that Lebow was told by Gonzales that Ortega was not eligible for rehire, and Lebow testified that Tapia never said he would rehire Ortiz. "Unrealized threats or tense personal relationships do not rise to the level of actionable retaliation." *Jeffries*, 1998 WL 318533*12. Here, it is clear that Lebow disliked Tapia's treatment of Martinez and his continued friendship with Ortiz. Martinez resigned because he was not certified to be a golf course superintendent. The Court finds that summary judgment should be entered in the City's favor for Counts II and III.

### Count V  - Claim of Constructive Discharge

Finally, the City moves for summary judgment on Lebow's claim of constructive discharge. Lebow alleges that her working conditions were so intolerable that she, in fact, had no option but to resign. To make out a constructive discharge claim, plaintiff must allege facts sufficient to show that under an objective test, a reasonable person would have viewed the working conditions as intolerable. *See* Jeffries, 1998 WL 318533*12 (quoting *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 343 (19th Cir. 1986). Again, the Court finds Lebow has not shown the presence of an intolerable working environment and that she had no choice but to resign. "[I]f an employee resigns of her own free will, even as a result of the employer's actions, the employee will not be held to have been constructively discharged." *Jeffries* at 12. Here, the City has shown that Lebow resigned because Martinez resigned. Lebow resigned of her own free will. Accordingly, summary judgment will be entered in favor of the City on Count V.

                                                          Lorenzo F. Garcia
                                                          United States Magistrate Judge

ATTORNEYS FOR PLAINTIFF:
Milton Lee Zentmyer, Esq.
Bruce E. Fogarty, Esq.

ATTORNEY FOR DEFENDANT:
Marcia E. Lubar, Esq.